**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**SAN ANGELO DIVISION**

|  |  |  |
|---|---|---|
| **JAN ELLEN ADAMS,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 6:05-CV-042-C** |
| | § | **ECF** |
| | § | **Referred to the U.S. Magistrate Judge** |
| **JO ANNE B. BARNHART,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

## REPORT AND RECOMMENDATION

**THIS MATTER** is before the court upon Plaintiff's complaint filed June 20, 2005, for judicial review of the administrative decision of the Commissioner of Social Security denying Plaintiff's applications for a period of disability and disability insurance benefits and for supplemental security income benefits under Title II and Title XVI of the Social Security Act. Plaintiff filed a brief in support of her complaint on October 27, 2005, and Defendant filed her brief on November 18, 2005. The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this matter to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment. This court, having considered the pleadings, the briefs, and the administrative record, recommends that the United States District Judge reverse the Commissioner's decision and remand this matter for further proceedings.

### I.   STATEMENT OF THE CASE

Plaintiff filed applications for a period of disability and disability insurance benefits and for supplemental security income benefits with a protective filing date of October 22, 2002, alleging

disability beginning February 22, 2001. Tr. 16, 70-71, 652-54. Plaintiff's applications were denied initially and upon reconsideration. Tr. 16, 38-42, 45-49, 641-54. Plaintiff filed a Request for Hearing by Administrative Law Judge on July 16, 2003, and this matter came for hearing before the Administrative Law Judge ("ALJ") on August 18, 2004. Tr. 16, 36-37, 655-89. Plaintiff, represented by a non-attorney, testified in her own behalf. Tr. 658-86. Michael Driscoll, a vocational expert ("VE"), appeared and testified as well. Tr. 16, 686-88. The ALJ issued a decision unfavorable to Plaintiff on December 14, 2004. Tr. 13-26.

In his opinion the ALJ noted that the specific issue was whether Plaintiff was under a disability within the meaning of the Social Security Act. He found that: Plaintiff met the disability insured status requirements on February 22, 2001, through December 31, 2001, and Plaintiff had not engaged in substantial gainful activity at any time since February 22, 2001. Tr. 17. Plaintiff has "severe" impairments, including systemic lupus erythematosus ("SLE"), fibromyalgia, obesity, reflux esophagitis, asthma, tension headaches, a history of bilateral carpal tunnel syndrome status post bilateral surgical releases, and diagnosed depression versus a bipolar disorder. *Id.* Plaintiff's severe impairments, singularly or in combination, were not severe enough to meet or equal in severity any impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1. *Id.* Plaintiff's borderline intellectual functioning was not a "severe" impairment because "her ability to understand, remember and carry out simple job instructions is not compromised by a full scale IQ of 75." Tr. 22. Therefore, the ALJ was required to determine whether Plaintiff retained the residual functional capacity ("RFC") to perform her past relevant work or other work existing in the national economy.

The ALJ noted Plaintiff's history of epigastric symptoms which later resolved. Tr. 18. The ALJ noted that by March 2002, Plaintiff was participating in a longitudinal study of her lupus symptoms and treatment and was monitored by a neurologist. *Id.* He noted Plaintiff's complaints

of increased fatigue, headaches, inability to sleep, increased fibromyalgia pain, and a rash on her

arms, legs, and trunk.  *Id*.  He noted that Plaintiff was treated with a short course of steroids and was

prescribed Neurontin.  *Id*.  He noted Plaintiff's report of a history of asthma, headaches, and poor

memory, as well as numbness and decreased grip strength in her hands bilaterally.  *Id*.  The ALJ

noted that upon examination, a different neurologist reported that Plaintiff had an appropriate affect;

demonstrated intact memory, attention, and concentration; had an intact gait, reflexes, strength, and

sensation; had a decreased grip strength, weakness of both abductor pollicis brevis muscles, and

positive Tinel's signs at the wrists bilaterally.  *Id*.  The ALJ noted that testing indicated moderate

left carpal tunnel syndrome, and a bilateral carpal tunnel release was performed in September 2002.

*Id*.     The ALJ noted Plaintiff's continued reports of headaches in January 2003. Tr. 19.  He noted

that Plaintiff underwent a consultative psychiatric evaluation, wherein she was diagnosed with a

dysthymic disorder[1] characterized by moderate symptoms, and was given a a Global Assessment of

---

[1]     The essential features of a dysthymic disorder include a chronically depressed mood that occurs for most of the day, more days than not, for at least two years.  *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 376-77 ("DSM-IV"). During periods of depressed mood at least two of the following symptoms are present: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness.  *Id*.  As described in the DSM-IV, this diagnosis is not made if the person had a symptom-free period of longer than two months during the initial two years, the symptoms include a major depressive episode during the initial two years, or if the person has ever had a manic, mixed, or hypomanic episode, or if the person has met the criteria for a cyclothymic disorder.  *Id*. at 377.

Functioning ("GAF")[2] score on Axis V[3] of 55,[4] as well as borderline intellectual functioning with a full scale IQ score of 75. *Id.*

The ALJ found that Plaintiff has underlying medically determinable impairments which could reasonably cause the symptoms alleged. Tr. 23. However, the ALJ found that, based on the evidence in the record as a whole, Plaintiff's statements concerning her impairments and their impact on her ability to work were not entirely credible, insofar as she alleged that she was completely unable to perform any work activity. *Id.* The ALJ discussed the evidence in the record and Plaintiff's subjective complaints regarding her impairments and the limitations imposed therein. *Id.* He noted that "[t]he evidence clearly establishes a pattern of significant complaints about a variety of impairments with little or no objective verification of significant functional limitation." *Id.* The ALJ ultimately found that Plaintiff "has exaggerated both the nature and the severity of her symptoms in an overt attempt to obtain disability benefits." Tr. 24.

The ALJ found that Plaintiff retained the RFC to perform simple, repetitive sedentary work activity on a sustained and continuing basis. Tr. 25. The ALJ found that Plaintiff could not return to her past relevant work as a nurse's aide or cook. Tr. 24. He noted that Plaintiff was considered a "younger" person with a 12th grade education. Tr. 25; *see* 20 C.F.R. §§ 416.963, 416.964. Having

---

[2]     The GAF score on Axis V is for reporting the client's "psychological, social, and occupational functioning." *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32 ("DSM-IV"). This report of overall functioning is noted to be "useful in planning treatment and measuring its impact, and in predicting outcome." *Id.*

[3]     The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. *See generally, American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 25-30.

[4]     The DSM-IV defines a GAF score of 51-60 as moderate symptoms (e.g. flat effect, circumstantial speech, and occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32.

found that Plaintiff could not perform the full range of sedentary work, the ALJ turned to the testimony of the VE in determining whether Plaintiff was capable of making a vocational adjustment to other work despite her severe impairments. *Id.* The ALJ relied upon the testimony of the VE who indicated that a hypothetical person of Plaintiff's age, with Plaintiff's RFC and vocational history, could perform work which exists in the national economy, including the jobs of bench assembler, with 21,000 jobs in Texas and 300,000 jobs nationally; document preparer, with 2,500 jobs in Texas and 106,000 jobs nationally; and order clerk in the food/beverage industry, with 4,300 jobs in Texas and 182,000 jobs nationally. *Id.* The ALJ, therefore, concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of his decision. Tr. 16, 26.

Plaintiff submitted a Request for Review of Hearing Decision/Order on February 15, 2005. Tr. 10-11. The Appeals Council issued its opinion on April 19, 2005, indicating that although it had considered the contentions raised in Plaintiff's Request for Review, it nevertheless concluded that there was no basis for changing the ALJ's decision and denied Plaintiff's request. Tr. 7-9. The ALJ's decision, therefore, became the final decision of the Commissioner.

Plaintiff requested an extension of time to file a civil action in this matter, which was granted. On June 20, 2005, Plaintiff commenced this action which seeks judicial review of the Commissioner's decision that Plaintiff was not disabled.

## II.   STANDARD OF REVIEW

An individual may obtain a review of the final decision of the Commissioner by a United States District Court. 42 U.S.C. § 405(g). The court's review of a denial of disability benefits is limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the proper legal standards. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002)(citing *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000)). Substantial evidence "is more than a mere scintilla and less than a preponderance" and includes "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). The court will not re-weigh the evidence, try the questions *de novo*, or substitute its judgment for the Commissioner's, even if the court believes that the evidence weighs against the Commissioner's decision. *Masterson,* 309 F.3d at 272. "[C]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.* (quoting *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000)).

In order to qualify for disability insurance benefits or supplemental security income, a claimant has the burden of proving that he or she has a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity. Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit. *Newton,* 209 F.3d at 452; *see* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1527(a)(1).

The Commissioner follows a five-step process for determining whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520; *Masterson*, 309 F.3d at 271; *Newton*, 209 F.3d at 453. In this case, the ALJ found at step 5 that Plaintiff was not disabled because she retained the ability to perform work in the national economy. Tr. 16, 25.

### III.  DISCUSSION

Plaintiff claims that the ALJ's determination of Plaintiff's RFC is not supported by substantial evidence because the ALJ failed to consider the entire record and appropriately weigh and consider the reports and opinions of the treating and examining physicians with regard to Plaintiff's impairments and their effects on her ability to work; failed to consider all the effects of Plaintiff's impairment which are established in the record in determining his RFC assessment; failed to properly evaluate the testimony of Plaintiff; and failed to determine whether Plaintiff could not maintain employment in light of her mental impairments.

A.     **Whether the ALJ's determination of Plaintiff's RFC is supported by substantial evidence.**

Plaintiff argues that the ALJ erred in making his RFC in several respects.  She argues that the ALJ failed to give appropriate weight to the opinions of her treating and examining physicians, particularly as to the limitations imposed by her impairments, failed to consider and incorporate all of the limitations imposed by her impairments into the RFC finding, and failed to appropriately consider her own testimony as to the limitations imposed by her impairments.  She argues that as a result of these errors, the RFC assessment does not reflect all of the limitations established by the record.  The ultimate issue is whether the ALJ's decision is supported by substantial evidence.  The court, therefore, must review the record to determine whether it "yields such evidence as would allow a reasonable mind to accept the conclusion reached by the ALJ." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

The opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight in determining disability. A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).  On the other hand, "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 456.

However, "[a]mong the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'  These determinations are legal

conclusions that the regulation describes as 'reserved to the Commissioner.'" *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003)(citing 20 C.F.R. § 404.1527(e)(1)).

Unless the Commissioner gives a treating source's opinion controlling weight, the Commissioner will consider six factors in deciding the weight to give to any medical opinion. 20 C.F.R. § 404.1527(d). The Fifth Circuit held in *Newton* that "an ALJ is required to consider each of the [six] factors before declining to give any weight to the opinions of the claimant's treating specialist." *Newton,* 209 F.3d at 456. Thus, the ALJ is required to consider the six factors if he does not give a treating source's opinion controlling weight or if he declines to give the opinion of a treating specialist any weight. Pursuant to Soc. Sec. Ruling 96-2p (July 2, 1996)("SSR 96-2p"), and 20 CFR §§ 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. The requirement that the ALJ discuss the six factors set forth in *Newton* and 20 C.F.R. § 404.1527(d) applies only to medical opinions and does not apply to conclusory statements that a claimant is disabled. *Frank*, 326 F.3d at 620.

Plaintiff argues that the ALJ failed to find any limitations imposed by her debilitating headaches and ignored the evidence in the record. Plaintiff notes that the ALJ failed to incorporate any such limitations into his RFC finding or into the hypothetical question posed to the VE. Plaintiff also argues that the ALJ ignored the limitations imposed by her arthritis and carpal tunnel syndrome. Plaintiff alleges that the limitations actually imposed by these impairments would necessarily impact the availability of jobs, given that the jobs identified by the VE require extensive use of the hands and fingers.

Plaintiff further notes that the ALJ failed to accept the extensive limitations noted by Drs. William E. Bazzell and Robin Brey and failed to appropriately weigh and evaluate the opinions of these doctors as required by *Newton*. She argues that the ALJ failed to discuss the relevant factors

in determining not to give controlling weight to the opinions of her treating sources and failed to give deference to these opinions even if not accorded controlling weight.

Plaintiff underwent a psychiatric examination on February 14, 2003. Tr. 269-71. Carlos Escobar, M.D., the psychiatric consultative examiner, noted that Plaintiff reported having never received any psychiatric treatment. Tr. 269. He noted that she denied any symptoms consistent with panic, anxiety, or any episodes of depression. *Id.* He noted Plaintiff's report of a history of headaches, as well as asthma. *Id.* Dr. Escobar noted Plaintiff's report of seeing friends daily, but not leaving the apartment, using public transportation, or attending church. Tr. 270. He noted that Plaintiff was fully alert and oriented to place, person, and time, with spontaneous and well-articulated speech. *Id.* He noted that Plaintiff's intelligence was in the borderline range, and she could perform simple additions and subtractions, although she reported that she cannot spell well. *Id.* Dr. Escobar noted no thought disorder, no reports of hallucinations, no paranoia, and no compulsions or obsessions. *Id.* He noted that Plaintiff's affect was constricted and mood was described as "feeling tired." *Id.* Dr. Escobar's impression was dysthymic disorder, borderline intellectual function with a full scale IQ of 75, and opined that Plaintiff had a GAF score of 55 at that time. Tr. 271.

Plaintiff was examined by John L. Read, M.D., an internal medicine consultative examiner, on February 22, 2003. Tr. 272-78. Dr. Read noted Plaintiff's report of severe headaches which last two to three hours and are not relieved by medication. Tr. 273. He noted that Plaintiff's speech, cranial nerves, and motor function appeared normal upon examination. Tr. 276. He noted Plaintiff's report of being able to walk only one block at a time because of pain and fatigue, the ability to sit for 15 or 20 minutes, to be "up and about" for less than one-half hour, and to stand still for about 15 minutes. Tr. 277. He also noted Plaintiff's report of being able to lift eight pounds and handle small objects, button clothing, and handle coins and keys, except on days when her fingers are

bothering her.  *Id*.   He noted that Plaintiff was able to bend over and touch the floor, as well as squat, without difficulty.  *Id*.  He noted that Plaintiff was able to walk well in tandem and fairly well on her toes and heels.  *Id*.  Dr. Read also indicated that range of motion in all extremities was satisfactory.  *Id*.

Luis Rodriguez, M.D., Plaintiff's treating physician, completed a form describing Plaintiff's functional capacity dated May 15, 2003.  Tr. 305-08.  Dr. Rodriguez noted that Plaintiff's symptoms included joint pain and lack of energy.  Tr. 305.  He opined that emotional factors contributed to the severity of Plaintiff's symptoms.  *Id*.  He opined that Plaintiff's experience of pain would "constantly" be severe enough to interfere with her attention and concentration.  *Id.*  Dr. Rodriguez opined that lifting and carrying were not affected by Plaintiff's impairments but also opined that Plaintiff could frequently lift or carry eight pounds and could occasionally lift or carry up to 15 pounds.  Tr. 306.  He opined that Plaintiff could perform overhead lifting and noted no limitations on reaching, fingering, pushing/pulling, handling, or feeling.  *Id*.  Dr. Rodriguez opined that Plaintiff could stand/walk a total of two hours in an 8-hour workday, and could stand/walk continuously for ½ hour at time.  *Id*.  He opined that Plaintiff could sit a total of one hour in an 8-hour work day and could do so continuously.  Tr. 307.  He indicated that Plaintiff develops low back pain and leg pain after about 30 minutes to one hour.  *Id*.  Dr. Rodriguez indicated that Plaintiff should never climb or crawl but could occasionally balance, stoop, crouch, and kneel.  *Id*.  He also opined that Plaintiff could do work if she could alternate between sitting and standing and further opined that if the restrictions noted were complied with, Plaintiff could work an 8-hour workday on an ongoing basis. *Id*.  Dr. Rodriguez finally noted that Plaintiff has "major depression" and was under the care of a psychiatrist.  Tr. 308.

Plaintiff received treatment from La Esperanza clinic.  On August 3, 2001, her treatment provider noted her report of epigastric pain, which was still present but less severe.  Tr. 322.

Plaintiff was referred for a GI consult. *Id*. A note from September 11, 2001, indicates that Plaintiff's epigastric pain resolved after she discontinued over-the-counter NSAID medications. Tr. 321. A progress note dated March 27, 2002, indicates Plaintiff's complaint of headaches for which she was prescribed Neurontin. Tr. 319. On April 30, 2002, Plaintiff reported that the Neurontin was not helping with her headaches, and the dosage was increased. Tr. 318. On August 15, 2002, Plaintiff reported that she was still having headaches. Tr. 317. Chronic headaches and a sinus headache were noted on January 8, 2003, and her Neurontin had been reduced in dosage. Tr. 314. On April 9, 2003, it was noted that Plaintiff continued to experience headaches, on a daily basis, which sometimes lasted all day. Tr. 313. Plaintiff reported some relief with Lortab. *Id*. Plaintiff reported that she was depressed, had crying spells, felt hopeless, had a poor appetite, had trouble sleeping, and did not want to get up or get out of her house. *Id*. A progress note dated May 9, 2003, indicates that Plaintiff's headaches had resolved after her psychiatrist had prescribed medication which provided good control of her depressive symptoms and headaches. Tr. 311. This progress note also indicated that Plaintiff takes Lortab for generalized body aches at least twice daily, with good pain control. *Id*. Plaintiff was seen for a four-month follow-up on September 9, 2003, wherein she reported left upper quadrant abdominal pain. Tr. 379. Plaintiff reported pain on November 13, 2003, and indicated that she had been diagnosed with nerve compression and was taking Lortab, with good pain control. Tr. 377. Plaintiff was treated in December 2003 for a bug bite that developed into cellulitis. Tr. 373-75. On February 27, 2004, Plaintiff was noted to have no complaints. Tr. 371.

Plaintiff received psychiatric treatment from Dr. Bazzell. Tr. 356-68. Dr. Bazzell conducted a diagnostic interview on April 9, 2003. Tr. 366-68. He noted that Plaintiff reported that she was anxious at times, experienced panic daily, had poor concentration and poor appetite, experienced fatigue all of the time, was irritable, and did not want to leave her apartment. Tr. 366. Upon mental

status examination, he noted that Plaintiff was alert, coherent, and had goal directed speech.  Tr. 367.

He noted no hallucinations, paranoid ideation, or thought disorder.  *Id.*  He noted that Plaintiff was

unable to do serial sevens or threes, spelled "world" backwards, had a fairly good fund of a

knowledge, with intact judgment and fair insight.  *Id.*  Dr. Bazzell's diagnosis on Axis I was major

depressive disorder, and he opined that Plaintiff had a GAF score of 55.  Tr. 368.  On April 23,

2002,  Dr. Bazzell indicated that Plaintiff's concentration was poor and noted Plaintiff's report of

watching television but not paying attention to it.  Tr. 365.  He noted that Plaintiff was in a good

mood on May 7, 2003, but still had poor concentration.  Tr. 364.  On June 4, 2003, Dr. Bazzell

indicated that Plaintiff's concentration was diminished but had improved somewhat, and he noted

no side effects from Plaintiff's medication.  Tr. 362.  However, Dr. Bazzell noted on November 17,

2003, that Plaintiff's concentration was good.  Tr. 357.  He also noted that Plaintiff was now "fairly

active" and was going out more, although she was not working and was "awaiting disability."  Tr.

357.  Dr. Bazzell opined on December 29, 2003, that Plaintiff's concentration was good, Plaintiff's

mood was good, there was no anxiety or panic, and Plaintiff was "still trying for disability."  Tr. 356.

Dr. Bazzell completed a mental residual functional capacity form on August 6, 2004.  Tr.

428-32.  He opined, by checkmark, that Plaintiff was limited in making simple, work-related

decisions; was seriously limited, but not precluded, from maintaining attention for 2-hour segments,

completing a normal work day and work week without interruptions from psychologically based

symptoms, and setting realistic goals or making independent plans; and was unable to meet

competitive standards of performing at a consistent pace without an unreasonable number and length

of rest periods, dealing with normal work stress, and dealing with the stress of semi-skilled and

skilled work. Tr. 430-31.  Dr. Bazzell indicated that "depression makes the pain worse." Tr. 431.

In short memoranda dated August 27, 2004, Dr. Bazzell indicated that Plaintiff's diagnosis was

bipolar disorder.  Tr. 465-66.

Plaintiff was seen by Dr. Brey as part of a clinical study on SLE. Dr. Brey completed a residual functional capacity assessment form on May 6, 2004. Tr. 424-27. Dr. Brey noted that Plaintiff's symptoms included fatigue, memory loss, and pain. Tr. 424. He opined that emotional factors did not contribute to the severity of Plaintiff's symptoms. *Id*. He opined that Plaintiff's experience of pain would frequently be severe enough to interfere with her attention and concentration. *Id*. He indicated that Plaintiff could lift and carry up to five pounds, that her ability to reach and feel was moderately affected by her impairment, and that her ability to push/pull was severely affected by her impairment. Tr. 425. Dr. Brey indicated that Plaintiff could stand/walk up to two hours a day in an 8-hour work day and could do so continuously. *Id*. He further opined that she could sit up to four hours in an 8-hour work day, sitting up to two hours continuously. Tr. 426. Dr. Brey indicated that Plaintiff should never kneel or crawl and could occasionally climb, balance, stoop, or crouch. *Id*. Dr. Brey opined that Plaintiff could not, even if such restrictions were followed, work an 8-hour work day on an ongoing basis. *Id*.

Dr. Brey completed a second questionnaire on August 10, 2004. Tr. 451-59. He noted that Plaintiff's symptoms included pain, memory problems, concentration problems, and fatigue. Tr. 451. He described her pain as moderate to severe episodic joint pain. *Id*. He opined that Plaintiff was "incapable of even 'low stress' jobs." Tr. 452. Dr. Brey also opined that Plaintiff could walk five blocks, could sit for a total of two hours in an 8-hour work day and do so continuously; could sit and stand/walk about two hours in an 8-hour work day; required unscheduled 30-minutes breaks every 10 minutes; and needed to be able to alternate between sitting and standing. Tr. 452-54. He opined that Plaintiff could occasionally lift less than 10 pounds and should never twist, stoop, squat, climb ladders, or climb stairs. Tr. 454. Dr. Brey opined that Plaintiff had significant limitations with reaching, handling, and fingering. *Id*. He also opined that Plaintiff could finger, grasp/twist/turn the hands, and reach overhead with the arms for 5% of the workday. *Id*. Dr. Brey

also indicated that Plaintiff should avoid concentrated exposure to extreme heat and cold, humidity, wetness, smoke, perfumes, soldering flames, solvents, fumes, dust, chemicals, and other unspecified irritants. *Id*. He noted that Plaintiff would likely have "good days" and bad days" and would likely miss more than four days per month of work because of her impairments. Tr. 455. He also indicated that Plaintiff experiences "cognitive dysfunction." *Id*.

In another questionnaire also dated August 10, 2004, Dr. Brey opined that Plaintiff must walk every 60 minutes during an 8-hour work day for a 10-minute period. Tr. 458. He opined that Plaintiff would need to take 30-minute breaks every two hours. *Id*. He completed a mental residual functional capacity assessment form and indicated by checkmark that Plaintiff was markedly limited in her ability to remember locations and work-like procedures, the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to complete a normal work day and work week without interruptions from psychologicaly based symptoms, and the ability to use public transportation. Tr. 461-62. Dr. Brey indicated that Plaintiff was moderately limited in all other functional areas and had experienced one episode of decompensation. Tr. 461-63. He indicated that this assessment was based upon neuropsychological testing of Plaintiff which indicated moderate to severe defects. Tr. 463.

Notes from the SLE study indicate that on November 27, 2001, Plaintiff reported having headaches every day. Tr. 632. On March 9, 2002, Plaintiff reported that her headaches had worsened and that she still experienced them every day. Tr. 623. Plaintiff reported on February 15, 2003, that her daily headaches were severe and had gotten worse. Tr. 616. By July 12, 2003, Plaintiff reported by she experienced two or three headaches per day. Tr. 608. Plaintiff again reported daily headaches on April 17, 2004. Tr. 592. Each of these reports indicated that these headaches interfered with Plaintiff's daily activities. Tr. 592, 608, 616, 623, 632. Cognitive impairment on was also noted on each of these dates. Tr. 553, 562, 566, 570, 574.

Notes of the November 27, 2001, study exam indicate that Plaintiff's intellectual or cognitive condition was moderately impaired – interfering with daily activities, but only mildly.  Tr. 550. Plaintiff's station and gait, sensory exam, cerebellar exam, and certain items of the motor exam were noted to be normal.  Tr. 545-49.  Plaintiff's upper extremities were noted to be normal.  Tr. 545.

On March 9, 2002, Plaintiff's intellectual/cognitive function was noted to be mildly impaired – constituting a nuisance only and not interfering with daily activities.  Tr. 540.  All other exams, except for the absence of drift and fix, were normal.  Tr. 534-39.  The February 15, 2003, notes indicate that Plaintiff's intellectual/cognitive capacity was moderately impaired.  Tr. 531.  Plaintiff was noted to be mildly impaired in this area on July 12, 2003, and moderately impaired on November 8, 2003  Tr. 510, 520.

The record further demonstrates that Plaintiff was treated for bilateral carpel tunnel syndrome and underwent left and right carpal tunnel release.  Tr. 438-47.

The record demonstrates that the ALJ declined to accept the opinion of Dr. Brey, the neurologist who treated her as a part of the SLE study, insofar as he opined that Plaintiff was completely disabled.  Tr. 22.  The ALJ found that Dr. Brey's conclusions were "completely uncorroborated by any objective clinical evidence contained in the record" and further noted that there was no evidence indicating that Dr. Brey had actually documented any observed deficits.  *Id.*

The ALJ also declined to accept the opinion of Dr. Bazzell as to Plaintiff's ability to perform the mental requirements of work activity, finding that such opinions were wholly unsupported by any objective clinical evidence, including the treating psychiatrist's own progress notes.  Tr. 20.

Plaintiff argues that the ALJ erred by failing to incorporate any limitations based on her headaches and on her ability to use her hands into the RFC assessment and into the hypothetical question posed to the VE.  She further argues that the ALJ failed to appropriately consider her testimony and her subjective allegations of pain.

-15-

With regard to Plaintiff's headaches, the record demonstrates that she repeatedly reported them to her treatment providers. Plaintiff reported chronic headaches, as well as sinus headaches, to her treating physicians at La Esperanza clinic on numerous occasions and reported no relief from Neurontin and some relief with Lortab. Tr. 313-14, 317-19. Plaintiff reported severe headaches, which she experienced daily and sometimes two or three times a day, which interfered with her daily activities as part of the SLE study and her treatment by Dr. Brey, from November 27, 2001, through April 17, 2004. Tr. 592, 608, 616, 623, 632. Plaintiff testified that she had headaches four or five times a week, which required her to go to bed about three times a week. Tr. 664. She testified that she lies down without lights, noise, or television when she has such headaches. *Id.* Dr. Read, the consultative medical examiner, noted Plaintiff's report of severe headaches which last two to three hours and which are not relieved by medication. Tr. 273.

While a progress note dated May 9, 2003, did indicate that Plaintiff's headaches had resolved, after her psychiatrist had prescribed her medication which provided good control of her depressive symptoms and headaches, Dr. Bazzell's records further indicate that Plaintiff's medications were adjusted and changed thereafter. Tr. 359-63. Plaintiff's consistently continued to report her headaches to Dr. Brey as part of the SLE study. Tr. 592, 608, 616, 623, 632.

In his opinion the ALJ particularly pointed to the progress note indicating that she had "good control" of her headaches and depressive symptoms. Tr. 19. He also noted that Plaintiff had given different estimates of the frequency of her headaches and ultimately rejected her reports of her headaches throughout the SLE study and as set forth in her testimony.

The term "residual functional capacity assessment" describes an adjudicator's finding about the ability of an individual to perform work-related activities. Soc. Sec. Ruling 96-5p (July 2, 1996)("SSR 96-5p"). The RFC assessment is based upon "*all* of the relevant evidence in the case record," including, but not limited to, medical history, medical signs, and laboratory findings; the

effects of treatment; and reports of daily activities, lay evidence, recorded observations, medical source statements, and work evaluations.   Soc. Sec. Ruling 96-8p (July 2, 1996)("SSR 96-8p")(emphasis in original).   The ALJ is responsible for determining a claimant's RFC.   *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).   In making the RFC assessment and in determining the limitations imposed by a claimant's impairment(s), the ALJ is instructed to consider the entire record.   Soc. Sec. Ruling 96-7p (July 2, 1996)("SSR 96-8p".

The claimant has the burden to prove that she is disabled within the meaning of the Social Security Act.  *Fraga v. Bowen*, 810 F.2d 1296, 1301 (5th Cir.1987).   A physical or mental impairment is in turn defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. § 423(d)(3).   The existence of an impairment does not in itself establish disability; a claimant is disabled only if he or she is "incapable of engaging in any substantial gainful activity."  *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir.1986).

Moreover, the ALJ is not required to incorporate limitations into the hypothetical questions presented to the VE that he did not find to be supported in the record.  *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).   As noted, the ALJ did not find that Plaintiff's headaches imposed *any* limitations on her ability to perform work activity and essentially rejected Plaintiff's testimony and subjective allegations and descriptions of her headaches and the limitations they impose, as well as such notations in the medical record.   Indeed, the ALJ rejected almost all of the limitations noted by Plaintiff's treatment providers, accepting only Dr. Rodriguez' statement that *if* all of the limitations indicated were complied with, Plaintiff could perform work activity during an 8-hour workday on an ongoing basis. Tr. 20, 307-08.   In his opinion the ALJ characterized Dr. Rodriguez' statement as providing that Plaintiff was able to sustain full time work activity, providing she was able to alternate between sitting and standing, completely ignoring the statement directly following

-17-

– which indicated that "[i]f *all* of the above restrictions, if any, are complied with," Plaintiff could

work an 8-hour day on a continuing basis. Tr. 307 (emphasis supplied).   Dr. Rodriguez opined that

Plaintiff could sit *only* one hour in an 8-hour work day and could stand two hours in an 8-hour work

day.  He also noted that Plaintiff's pain would constantly interfere with her concentration, and he

indicated numerous postural limitations. Tr. 306-07.  The ALJ noted in his opinion that sedentary

jobs are defined as those which involve mostly sitting.  Tr. 24.  Indeed, the regulations provide that:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally
> lifting or carrying articles like docket files, ledgers, and small tools. Although a
> sedentary job is defined as one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job duties. Jobs are sedentary if
> walking and standing are required occasionally and other sedentary criteria are met.

20 CFR § 404.1567(a).  Although the ALJ indicates that he accepted, in part, those limitations noted

by Dr. Rodriguez, he effectively rejected *all* of the limitations noted by this treating physician, given

that Dr. Rodriguez specifically opined that Plaintiff could sit a total of one hour in an 8-hour

workday, a limitation at odds with the definition of sedentary work.

The ALJ also rejected the opinions of Dr. Brey and Dr. Bazzell as to the limitations imposed

by Plaintiff's impairments.  While the ALJ indicated that he rejected Dr. Bazzell's opinion insofar

as he "alleged disability" in the form he completed, the ALJ did not incorporate any of the specific

functional limitations noted by Dr. Bazzell into his RFC finding.  Tr. 21, 430-31.  The ALJ's

determination that Plaintiff could perform "simple, repetitive sedentary work activity which does

not require the exercise of independent judgment" does not address or reflect Dr. Bazzell's opinion

that Plaintiff was seriously limited, but not precluded, from maintaining attention for 2-hour

segments, completing a normal workday and workweek without interruptions from psychologically

based symptoms, and setting realistic goals; and was unable to meet competitive standards of

performing at a consistent pace without an unreasonable number and length of rest periods, dealing

with normal work stress, and dealing with the stress of semi-skilled and skilled work. Tr. 430-31. The ALJ also essentially rejected all of the limitations noted by Dr. Brey.

"The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record." *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991)(citing *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). The task of weighing the evidence is the province of the ALJ. *Chambliss v. Massanari*, 269 F.3d 520, 523 (5th Cir. 2001). The relative weight to be given these pieces of evidence is within the ALJ's discretion. *Id.* However, in weighing the evidence, the ALJ is not free to reject the uncontroverted opinions of a treating physician as to the limitations imposed by Plaintiff's impairments, solely because he has a "different interpretation of the evidence." *See Frank*, 326 F.3d at 622 (where the Fifth Circuit noted in dicta that the ALJ should not substitute his own medical conclusions about the effects of the claimant's impairments).

Clearly, questions of credibility are the responsibility of the ALJ to resolve. *Masterson*, 309 F.3d at 272. The ALJ was entitled to weigh the opinions of the treating physicians and even to reject them. However, in rejecting Dr. Bazzell's opinion, the ALJ noted that his treating records reflected improvement in Plaintiff's symptoms with medication. Tr. 21. A review of the record indicates that Dr. Bazzell's progress notes indicate that Plaintiff's symptoms of poor concentration and mood did improve at certain occasions. Although the ALJ purported to reject the opinions of Dr. Rodriguez, Dr. Bazzell, and Dr. Brey only insofar as they indicated that Plaintiff was "disabled," a review of these opinions indicate that the ALJ in fact rejected their medical opinions as to the specific limitations imposed by Plaintiff's impairments, not conclusory, non-medical opinions as to disability. The ALJ ultimately rejected these opinions, without discussing the factors set forth in *Newton.*

The ALJ further rejected Plaintiff's subjective allegations and her testimony regarding the limitations imposed by her impairments and also rejected the opinions of the state agency medical consultants.  Tr. 24.  A careful review of the record fails to uncover substantial evidence to support the ALJ's determination that Plaintiff retains the physical RFC to perform the exertional and nonexertional requirements of simple, repetitive sedentary level work activity which does not require the exercise of independent judgment.

However, there is substantial evidence of record indicating that Plaintiff's headaches imposed some limitation on her ability to perform work activity.   There is also substantial evidence indicating that Plaintiff experienced some functional limitation in the use of her hands because of her arthritis or her status post bilateral carpal tunnel release.   Plaintiff's testimony that she experienced problems using her hands and gripping is consistent with her reports to Dr. Brey, with Dr. Brey's medical opinions as to the limitations imposed by her impairments, and with the opinion of Dr. Rodriguez. The only limitation that the ALJ incorporated into his RFC assessment was a restriction to simple, repetitive work which did not require the exercise of independent judgment.  A review of the record as a whole demonstrates that the ALJ failed to properly weigh and consider the opinions of Plaintiff's treating physicians, failed to appropriately consider Plaintiff's testimony and her subjective allegations as to the limitations imposed by her impairments, and failed to base his RFC finding upon substantial evidence.

I find that the ALJ opinion was not supported by substantial evidence in the record.  Remand in this matter is required to allow the ALJ to appropriately consider and weigh the opinions of Plaintiff's treating physicians and Plaintiff's subjective allegations and testimony.   Upon remand, further consideration of the evidence in the record as to the limitations imposed by Plaintiff's impairments is necessary.

Because the RFC finding is not supported by substantial evidence, the hypothetical posed to the VE is similarly flawed. The ALJ is not required to incorporate limitations into the hypothetical questions presented to the VE that he did not find to be supported in the record. *See Morris,* 864 F.2d at 336. The hypothetical presented to the VE need only reasonably incorporate the limitations accepted by the ALJ. *See Bowling v. Shalala,* 36 F.3d 431, 435-36 (no reversible error where the hypothetical presented reasonably incorporated the limitations accepted by the ALJ and claimant's representative had the opportunity to present questions incorporating additional limitations). Upon remand and after determining Plaintiff's RFC, the ALJ will have the opportunity to present a hypothetical question to the VE which incorporates limitations which are accepted by the ALJ and which reflect the RFC finding.

Plaintiff further argues that the ALJ erred by failing to determine whether she could maintain or sustain work pursuant to *Watson,* 288 F.3d at 218, and *Singletary v. Bowen,* 798 F.2d 818, 822 (5th Cir. 1986). In *Singletary,* the Fifth Circuit noted that "[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time." *Singletary,* 798 F.2d at 822. The requirement for a finding of the ability to maintain employment is not restricted to instances where non-exertional impairments are present. *See Watson,* 288 F.3d at 217-18.

In *Watson,* the claimant had degenerative disk disease, which caused the loss of movement in his legs every few weeks and too much pain to work every few weeks. *Watson,* 288 F.3d. at 218. In *Wingo,* the ALJ found that the claimant retained the residual functional capacity to perform the full range of work at the sedentary level and applied the Medical-Vocational Guidelines to direct a finding of "not disabled." *Wingo v. Bowen,* 852 F.2d 827, 829 (5th Cir. 1998). The ALJ in *Wingo* did not consider medical evidence about several of the claimant's impairments, as well as evidence

-21-

that she was often unable to leave her bed for days at a time. *Id.* Plaintiff argues that because of her severe headaches and mental problems, like the claimant in *Singletary*, she is unable to maintain employment.

In the recent case of *Perez v. Barnhart*, the Fifth Circuit clarified that "nothing in *Watson* suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case." *Perez v. Barnhart*, 415 F.3d. 457, 465 (5th Cir. 2005)(comparing *Frank* with *Watson*). Rather, a finding of ability to maintain employment is only required in a "situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms." *Id.* The court noted that "[w]ithout such a showing, the claimant's ability to maintain employment is subsumed in the RFC determination." *Id.*

While the evidence in this case clearly demonstrates that Plaintiff's headaches are, at times, worse, the evidence does not indicate that the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms." *Id.* Rather, the evidence indicates that Plaintiff's headaches and other impairments impose fairly regular limitations, as opposed to periodic disabling episodes. Plaintiff's testimony indicates a general worsening of overall condition. Having already found that this matter should be remanded for further consideration of the limitations imposed by all of Plaintiff's impairments, including her headaches, I decline to further address this issue. The ALJ may determine, upon further consideration, that an examination of this issue is warranted.

## IV.    CONCLUSION

Based upon the foregoing discussion of the issues, the evidence, and the law, this court recommends that the United States District Judge reverse the Commissioner's decision and remand this matter for further proceedings in accordance with this recommendation.

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1) and

Rule 4 of Miscellaneous Order No. 6, For the Northern District of Texas, any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within 11 days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory, or general objections.  A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within 11 days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the United States Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

DATED this 1st day of September, 2006.

**PHILIP R. LANE**
**UNITED STATES MAGISTRATE JUDGE**